# Exhibit 1

### CURRICULUM VITAE

5/23/13

### GEOFFREY C. HAZARD, JR

Miller Distinguished Professor of Law Emeritus, University of
        California, Hastings College of the Law
Trustee Professor of Law Emeritus, University of Pennsylvania
        Law School
Sterling Professor of Law Emeritus, Yale University
Director Emeritus, American Law Institute

Address:  2263 California Street
          San Francisco, CA 94115
          Tel:415-292-6535(home);415-565-4800(office)
          Fax: 415-292-2304
          Email: hazardg@uchastings.edu

          Hastings College of the Law
          200 McAllister St., San Francisco, CA 94102


#### EDUCATION

Swarthmore College, B.A. 1953 (Phi Beta Kappa)
Columbia University, LL.B. 1954 (Columbia Law Review)

#### PROFESSIONAL APPOINTMENTS

Member, California State Bar
Admitted to practice: Oregon, 1954; California, 1960;
Connecticut, 1982; Pennsylvania, 1994
Practiced in Oregon, 1954-57; Deputy Legislative Counsel, State
of Oregon, 1956-57; Executive Secretary, Oregon Legislative
Interim Committee on Judicial Administration, 1957-58
Executive Director, American Bar Foundation, 1964-70
Consultant, American Bar Association Special Committee on Code
        of Judicial Conduct, 1970-72
Reporter, American Bar Association Special Commission on
        Standards of Judicial Administration, 1971-77
Reporter, American Law Institute, Restatement of Judgments,
        Second, 1973-81
Reporter, American Bar Association Special Commission on
        Evaluation of Professional Standards, 1978-83

-+

Geoffrey C. Hazard, Jr.
Page 2

Reporter, Committee on Ethical Standards, National Association of
    Bond Counsel, 1983-84
Director, American Law Institute, 1984-1999
Reporter, American Law Institute and International Organization
    for Unification of Private Law, Principles of Transnational
    Civil Procedure, 1999-2005
Member and Consultant, Standing Committee on Rules of
    Practice and Procedure, Judicial Conference of the United
    States, 1994-
Member, Judicial Conference Ad Hoc Committee on Mass Torts,
    1997-99
Member, American Bar Association Resource Team for High Profile
    Trials 1996-1998
Member, American Bar Association Commission on Ethics2000,
    1997-2002
Member, Associazione Italiana fra gli Studiosi del Processo
    Civile, 1998-
Member, American Bar Association Task Force on Federal Preemption
    2008-2010
Senior Adviser, American Bar Association, Section of Business
    Law, 2007-09; Emeritus 2009-

ACADEMIC APPOINTMENTS

Miller Distinguished Professor of Law, University of California
    Hastings College of the Law, 2005-
Trustee Professor of Law, University of Pennsylvania, 1994-2009
Professor of Law, Yale University, 1971-94; Sterling Professor of
    Law Emeritus 1994-
Associate Professor of Law, University of California,
    Berkeley, 1958-61; Professor of Law, 1961-64
Visiting Professor, University of Michigan, 1963
Professor of Law, University of Chicago, 1964-71
Visiting Professor, Stanford University, 1974
Acting Dean, Yale School of Organization and Management,
    1980-81; Associate Dean, 1979-80; Deputy Dean, 1981-82
Visiting Professor, Universite d'Aix-Marseille, 1982
Visiting Professor, Harvard University, 1983
Visiting Professor, University of Arizona, 1997-2001

TEACHING SUBJECTS

Civil Procedure, Legal Ethics, Federal Jurisdiction

BOARD MEMBERSHIPS

-+

Board of Trustees, Supreme Court Historical Society, 1989-2004
Board of Directors, Avatar Holdings, Inc., 1980-94
Board of Directors, Smyth, Sanford & Gerard Professional
        Liability, L.L.C. 1995-97
Member, Board of Directors, Friends of the Library of the Supreme
        Court of Israel 1998-
Board of Governors, International Insolvency Institute, 2004-2010


PROFESSIONAL ACTIVITIES


Member, Administrative Conference of United States, 1972-78
Adviser, American Bar Association, Standing Committee on Ethics and
        Professional Responsibility, Subcommittee on Code of
        Judicial Conduct, 1988-89
Member, Board of Overseers, Institute for Civil Justice, RAND
        Corp.,1985-90
Advisory Council, Trinity Church (New York) Center for Ethics and
        Corporate Policy, 1983-1990
Legal Advisory Committee, New York Stock Exchange,1989-92
Member, American Bar Association Committee on Professional
        Discipline, 1985-91
Member, American Bar Association, Committee on Lawyers'
        Responsibility for Client Protection, 1991-1994
Member, National Association of Corporate Directors, Blue
        Ribbon Commission, 2005
Member, California State Bar, American Bar Ass'n, American Law
Institute, National Legal Aid and Defender Ass'n, Fellows of
American Bar Foundation, American Academy of Arts and Sciences,
American Philosophical Society

PROFESSIONAL AWARDS

American Bar Foundation, Research Award, 1985
American Bar Foundation, William Keck Foundation Award,1997
Columbia University School of Law Association, Medal for
        Excellence, 1999
American Judicature Society, Outstanding Contributions to
        Promoting Effective Administration of Justice. 1999
Ceremony of Salute, Superior Court of Pennsylvania, 1999
Gold Medal, International Insolvency Institute, 2004
American Bar Association Section of Legal Education, Kutak Award,
        2005
American Bar Association, Michael Franck Award, 2008
American Law Institute, Distinguished Service Award, 2013
-+

Geoffrey C. Hazard, Jr.
Page 4

HONORARY DEGREES

M.A., Yale University 1971
LL.D., Gonzaga University, 1985
LL.D., University of San Diego, 1985
LL.D., Swarthmore College, 1988
LL.D., Illinois Institute of Technology, 1990
LL.D., Nova University, 1992
LL.D., Republica Italiana (faculta di Urbino), 1998
Reconocimiento, Universidad National Autónoma de
      Mexico, 2006

BOOKS

RESEARCH IN CIVIL PROCEDURE (1963; Walter E. Meyer Research
      Institute of Law).
LAW IN A CHANGING AMERICA (1968; editor).
QUEST FOR JUSTICE (1973; editor, American Bar Association).
GOING TO LAW SCHOOL? (1974; editor, with Thomas Ehrlich).
CIVIL PROCEDURE (6th ed. 2011, with John Leubsdorf and Debra
Bassett).
ETHICS IN THE PRACTICE OF LAW (1978).
PLEADING & PROCEDURE, STATE & FEDERAL (10th ed. 2009; with
      Colin Tait, Wm. Fletcher and Stephen Bundy).
MANAGING COMPLEX LITIGATION:  A PRACTICAL GUIDE TO THE USE OF
      SPECIAL MASTERS (1983; with Wayne Brazil and Paul Rice).
 THE LEGAL PROFESSION: RESPONSIBILITY AND REGULATION (Concepts
      and Insights Series 2nd ed. 2007; with Deborah Rhode).
 THE LEGAL PROFESSION: RESPONSIBILITY AND REGULATION (Anthology
      3d ed. 1994; editor, with Deborah Rhode).
THE LAW OF LAWYERING:  A Handbook on the Model Rules of
      Professional Conduct (3d ed. 2004 with William Hodes).
PERSPECTIVES ON CIVIL PROCEDURE (1987; editor, with Jan Vetter).
BOARD GAMES: The Changing Shape of Corporate Power (1988; with
      Arthur Fleisher, Jr. and Miriam Z. Klipper).
THE LAW AND ETHICS OF LAWYERING (5th ed. 2009; with Susan Koniak,
      Roger Cramton, George Cohen and Bradley Wendel)
LA GUISTA CIVIL NEGLI STATI UNITI (1993; with Michele Taruffo)
AMERICAN CIVIL PROCEDURE:  AN INTRODUCTION (1993, with Michele Taruffo)
AMERICAN CIVIL PROCEDURE: AN INTRODUCTION (Japanese ed., Tanabe
      Tr. 1997)
LA JUSTICIA CIVIL IN LOS ESTADOS UNIDOS (Spanish ed., Gascón
      Inchausti Tr. 2006)

-+

Geoffrey C. Hazard, Jr.
Page 5

POKUS`ENI` SPRA `NI` CHI RAD (Prague, 1996; translation of
    BOARD GAMES, with Arthur Fleisher, Jr. and Miriam Z.
    Klipper)
PROFESSIONAL RESPONSIBILITY AND REGULATION (Foundation Press,
    2002) (with Deborah Rhode)
LEGAL ETHICS: A COMPARATIVE STUDY (Stan. U. Press. 2004)(with
    Angelo Dondi)
ETICHE della PROFESSIONE LEGALE (il Mulino 2005) (with Angelo
    Dondi)
ETICA JURIDICA UM ESTUDO COMPARATIVO (wmfmartinsfontes, 2011)
    (with Angelo Dondi)
MORAL FOUNDATIONS OF AMERICA LAW (Intersentia, 2013(with Douglas
    S. Pinto)


REPORTS
(as reporter or draftsman)

Oregon Legislative Interim Commission on Judicial Administration,
    Vol. I (Judicial Administration), Vol. II (Juvenile Code)
    (1958)
California Special Legislative Commission on the Insanity
    Defense, Report (1962).
American Bar Association, Code of Judicial Conduct (1972).
American Bar Association, Standards of Judicial Administration
    (3 vol., 1974-77).
Legal Services for the Average Citizen, Report of A.B.A.
    Consortium on Legal Services (1977).
American Law Institute, Restatement Second of Judgments (1982).
American Bar Association, Model Rules of Professional Conduct
    (1983).
National Association of Bond Lawyers, Function and Professional
    Responsibilities of Bond Counsel (1984).
American Law Institute and International Organization for
    Unification of Private Law, Principles of Transnational
    Civil Procedure (2005).


ARTICLES

May v. Anderson:  Preamble to Family Law Chaos,
    45 Va. L. Rev. 379 (1959)

Oregon Administrative Procedure Act -- Status and Prospects,
    39 Ore. L. Rev. 97 (1960).

Indispensable Party:  The Historical Origin of a Procedural
-+

Geoffrey C. Hazard, Jr.
Page 6

Phantom, 61 Colum. Law Rev. 1254 (1961).

Insanity as a Defense:  The Bifurcated Trial,
        49 Calif. L.Rev. 805 (1961) (with D. W. Louisell).

Death, the State, and the Insane:  Stay of Execution,
        9 U.C.L.A. Rev. 381 (1962) (with D. W. Louisell).

Early Evolution of the Common Law Writs:  A Sketch,
        6 Am. J. Legal Hist. 114 (1962).

An Historical and Critical Analysis of Interpleader,
        52 Calif. L. Rev. 706 (1963) (with Myron Moskovitz).

The Research Program of the American Bar Foundation,
        51 A.B.A.J. 539 (1965).

Reflections on Four Studies of the Legal Profession, in
        Law and Society, A Supplemental to Social Problems
        (Summer, 1965).

After the Trial Court -- The Realities of Appellate Review,
        in Jones, Harry W., ed., The Courts, the Public and the
        Law Explosion (1965).

A General Theory of State-Court Jurisdiction,
        1965 Sup. Ct. Rev. 241.

Rationing Justice, 8 J. Law & Econ. 1 (1965).

Limitations on the Uses of Behavioral Science in the Law,
        19 Case Western L. Rev. 71 (1967).

The Ombudsman:  Quasi-Legal and Legal Representation in Public
        Assistance Administration, in Sherrard, ed.,Social
        Welfare and Urban Problems (1968).

Challenges to Legal Education, in Sutherland, ed.
        The Path of the Law from 1967 (1968), pp. 185-194.

Epilogue to the Criminal Justice Survey, 55 A.B.A.J. 1048 (1969).

Social Justice Through Civil Justice, 36 U. Chi. L. Rev. 699
        (1969).

-+

Geoffrey C. Hazard, Jr.
Page 7

Law Reforming in the Anti-Poverty Effort, 37 U. Chi. L. Rev. 242
      (1970).

Legal Problems Peculiar to the Poor, 26 J. Social Issues 47
      (1970).

Securing Courtroom Decorum, 80 Yale L. J. 433 (1970)(book
      review).

Res Nova in Res Judicata, 44 So. Calif. L. Rev. 1036 (1971).

Court Finance and Unitary Budgeting, 81 Yale L. J. 1286
      (1972)(with Martin B. McNamara and Irwin F. Sentilles, III)

Attorneys' Responsibilities and Duties Under the Securities Laws,
      in Goldberg, Stuart C., ed., Expanding  Responsibilities
      Under the Securities Laws (1973).

The Effect of the Class Action Device Upon the Substantive Law,
      58 F.R.D 299 (1973).

Legal Services in the U.S.A., 2 Internat=l J.of Crim. and
      Pen. 43 (1974).

Chancery Procedure and the Seventh Amendment: Jury Trial of
      Issues in Equity Cases before 1791, 83 Yale L. J.  999 (1974)
      (with Harold Chesnin).

Law School ALaw@ and Sociolegal Research,
      50 Denver L. J. 403 (1974).

Rethinking Legal Ethics, 26 Stan. L. Rev. 1227 (1974).

Conscience and Circumstance in Legal Ethics, in Hodges, ed.,
      Social Responsibility: Journalism, Law, Medicine
      (Wash. & Lee Univ., 1975).

Administration of Supporting Services in the Trial Court,
      1 Justice System Journal 3 (1975).

Representation in Rule-Making, in Schwartz, ed.,
      Law and the American Future (1975).

The Tennessee Administrative Procedure Act:  An Outsider's
      Perspective, 6 Memphis State U. L. Rev. 143 (1976).

-+

Geoffrey C. Hazard, Jr.
Page 8

Standards of Judicial Administration:  Appellate Courts,
        62 A.B.A.J. 1015 (1976).

The Jurisprudence of Juvenile Deviance, in Rosenheim, ed.,
        Pursuing Justice for the Child (1976).

Requisites of a Valid Judgment, 24 Practical Lawyer 35 (1978).

The Supreme Court as Legislature, 64 Cornell L. Rev. 1 (1978).

An Historical Perspective on the Lawyer-Client Privilege,
        66 Calif. L. Rev. 1061 (1978).

Talking to Your Lawyer, MBA, May 1978, 17.

The Legal and Ethical Position of the Code of Professional
        Ethics, V Social Responsibility: Journalism, Law, Medicine
        (Wash. & Lee Univ., 1979).

Interstate Venue, 64 Nw. L. Rev. 711 (1979).

Proposed Revision of the Rules of Legal Ethics in the United States,
        in Am. Bar Ass'n, American/Australian/New Zealand
        Law: Parallels and Contrasts (1980)

Guidelines for Claims of Privilege, United States v. Am. Tel.
        & Tel. Co., 86 F.R.D. 603 (1980) (with Paul Rice).

Rules of Legal Ethics: The Drafting Task, 36 The Record 77
        (1981).

Revisiting the Second Restatement of Judgments: Issue Preclu-
        sion and Related Problems, 66 Cornell L. Rev. 564
        (1981).

The Lawyer's Obligation to be Trustworthy When Dealing with
        Opposing Parties, 33 South Carolina L. Rev. 181 (1981).

How Far May a Lawyer Go in Assisting a Client in Legally
        Wrongful Conduct?, 35 U. of Miami L. Rev. 669 (1981).

Will the ABA Draft Model Rules of Professional Conduct Change the
        Concept of the Lawyer's Role?, Association of the Bar    of
        the City of New York (Third Orison Marden Memorial
        Lecture,1981).

-+

Geoffrey C. Hazard, Jr.
Page 9

The Lawyer's Pro Bono Obligation, in ABA <u>Proceedings of the</u>
<u>Second National Conference on Legal Services and the Public</u>
(1981).

Do Lawyers <u>Really</u> Need New Disciplinary Rules?,
53 <u>Cleveland Bar J.</u> 1 (1981).

Legal Ethics: Legal Rules and Professional Aspiration,
30 <u>Cleveland State L. Rev.</u> 4 (1982).

Liability of Attorneys Involved in the Preparation of
Disclosure Statements, in Fleischer, et al. eds.,
Thirteenth Annual Institute on Securities Regulation
(1982).

Arguing the Law: The Advocate's Duty and Opportunity,
16 <u>Georgia L. Rev.</u> 821 (1982).

Judicial Management of the Pretrial Process in Massive Litiga-
tion: Special Masters as Case Managers, 1982 <u>Am. Bar</u>
<u>Found. Res. J.</u> 375 (with Paul R. Rice).

The Criminal Justice System: Overview, in Encyclopedia of
Criminal Justice (1982).

Competing Aims in Legal Education, 59 <u>No. Dakota L. Rev.</u>
533 (1983).

Why Lawyers Should be Allowed to Advertise: A Market Analysis
of Legal Services, 58 <u>N.Y.U.L. Rev.</u> 1084 (1983), (with
Russell Pearce and Jeffrey Stempel) republished in Italian,
Perche Agli Avvocati Dovrebbe Essere Consentito L'Uso Della
Pubblicita, 32 Rivista Di Diritto Civile 277 (1986).

Preclusion as to Issues of Law:  The Legal System's Interest,
70 <u>Iowa L. Rev.</u> 81 (1984).

A Question of Scale, Harvard Law School Bulletin, Winter, 1984
(review of Bok report on legal education).

The Technical Expert in Procedure: U.S. National Report, in
Nicklisch, ed., Der Technische Sachverstandige im Prozess,
VII.Internationaler Kongress fur Prozessrecht, p. 207    (1984).

Legal Ethics, in Gillers, ed., Looking At Law School
(1984, 3d ed. 1990).

-+

Geoffrey C. Hazard, Jr.
Page 10

Rectification of Client Fraud: Death and Revival of a
        Professional Norm, 33 Emory L.J. 271 (1984).

Reflections on the Substance of Finality, 70 Cornell L.
        Rev. 642 (1985).

Curriculum Structure and Faculty Structure, 35 J. Legal Ed,
        326 (1985).

The Position of the Supreme Court in the Contemporary
        Constitutional System of the United States, in Lombardi,
        Constituzione e Giustizia Constituzionale nel Diritto
        Comparato (Centro Italiano per lo Sviluppo della
        Ricerca, 1985).

Ethical Considerations in Withdrawal, Expulsion, and Retirement
        [from a Firm], in Berger, ed., Withdrawal, Retirement &
        Disputes, Am. Bar Ass'n Section of Economics of Law
        Practice (1986).

Court Delay: Toward New Premises, 5 Civil Justice Q. 236
        (1986), republished in Italian, Costo e Durata del Processo
        in Italia e in U.S.A., 32 Rivista di Diritto Civile 271 (1986).

Quis custodiet ipsos custodes?, 95 Yale L.J. 1523 (1986)
        (book review).

Principles in Legislation, 41 The Record 685 (1986) (Cardozo Lecture).

Rising Above Principle, 135 U.Penn.L.Rev. 153 (1986)
        (Roberts Lecture).

A Lawyer's Privilege Against Self-Incrimination in Professional
        Disciplinary Proceedings, 96 Yale L.J. 1060 (1987) (with
        Cameron Beard).

Triangular Lawyer Relationships: An Exploratory Analysis,
        1 Georgetown J. Legal Ethics 15 (1987).

Permissive Affirmative Action for the Benefit of Blacks, 1987
        U.Illinois L.Rev. 379 (David C. Baum Memorial
        Lecture).

Professional Ethics, Rules and Conduct, in Conference Papers,

-+

Geoffrey C. Hazard, Jr.
Page 11

ALI-ABA Arden House III National Conference on the
Continuing Education of the Bar (November 13, 1987),
reprinted 34 CLE Journal and Register 5 (1988).

The Public Nature of Private Adjudication, 6 Yale L. & Pol'y
Rev. 42 (1988) (with Paul D. Scott).

Communitarian Ethics and Legal Justification, 59 U. of Colo. L.
Rev. 721 (1988).

Forms of Action Under The Federal Rules of Civil Procedure,
63 Notre Dame L. Rev. 628 (1988).

Four Portraits of Law Practice, 57 UMKC L. Rev. 1 (1988).

Ethics and Politics in the Corporate World, 6 Yale J. on
Regulation 155 (1989) (book review).

Discovery Vices and Trans-Substantive Virtues in the Federal
Rules of Civil Procedure, 137 U. Penn. L. Rev. 2237 (1989).

Authority in the Dock, 69 Boston U. L. Rev. 469 (1989).

My Station as a Lawyer, 6 Georgia State U. L. Rev. 1 (1989).

Per un approcio manageriale al problema dei ritardi
nell'amministrazione della guistizia, 43 Rivista
Trimestrial di Diritto e Procedura Civile, No. 4, p. 960
(Dicembre 1989), translated by Dttr. Angelo Dondi.

After Professional Virtue, 1989 Supreme Court Rev., 213.

Law and Business Ethics, in Reitzel, et al. Contemporary
Business Law (4th ed. 1990).

The Role of the Legal System in Response to Public Risk, Fall 1990
Daedalus, 229.

Ethical Opportunity in the Practice of Law, 27 San Diego L.Rev.
127 (1990).

It Smacks of Elitism, Am. Law Inst. Remarks and Addresses,
May l5-l8, 1990.

-+

Geoffrey C. Hazard, Jr.
Page 12

The Future of Legal Ethics, 100 Yale L.J. 1239 (1991).

Il processo con giuria come modello processuale,@ 45 Rivista
Trimestrial di Diritto e Procedura Civile,
No. 2, p. 479(Giugno, 1991), translated by Dttr.
Angelo Dondi.

Swimwear for the Ethics Goldfish Bowl, 26 Int'l Soc'y of
Barristers Quarterly 297 (1991).

Equality in Civil Litigation, In Kojima, ed., America no
Daishihou Shisutemu ("Grand Justice System: American
Style"), Chiou University Institute of Comparative Law (1992).

L'avvocato e l'etica professionale: gli aspetti giuridici,
Il Foro Italiano, June, 1992, V, 215, translated by
Dttr.Angelo Dondi

Justice Marshall in the Medium of Civil Procedure: Portrait of a
Master, 80 Georgetown L.J. 2063 (1992).

Doing the Right Thing, 70 Washington U.L.Q. 691 (1992).

Alvin B. Rubin: Man of the Law, 52 Louisiana L. Rev. 1481
(1992).

Lawyers and Client Fraud: They Still Don't Get It,
6 Georgetown J. of Legal Ethics 701 (1993).

Sources of Delays, Motions to Disqualify Could be Handled
Promptly Through ADR, July 1993 Alternatives to the
High Cost of Litigation (Center for Public Resources).

The Role of the Legal System in Responses to Public Risk, in
E. Burger, ed., Risk (U. Michigan Press 1993).

Dimensions of Ethical Responsibility: Relevant Others,
54 U.Pittsburgh L. Rev. 965 (1993).

Lawyer Liability in Third Party Situations:  The Meaning of
the Kaye Scholer Case, 26 U. Akron L. Rev. 395.

Reflections on Judge Weinstein's Ethical Dilemmas in Mass Tort
Litigation, 88 Northwestern U. L. Rev. 569 (1994).

The American Law Institute: What it is and What it Does,
-+

Geoffrey C. Hazard, Jr.
Page 13

Centro do Studi e Ricerche di Diritto Comparato e
    Straniero,Saggi, Conferenze e Seminari, (1994).

Azioni di Responsabilita Verso gli Amministratori di Societa
    Commerciali nel Diritto Statunitense, 39 Rivista delle
    Societa 441 (1994).

Conflict of Interest in Estate Planning for Husband and Wife,
    20 The Probate Lawyer 1 (1994).

Equality and Selectivity in American Civil Litigation, in
    T. Kojima, T. Atsumi, H. Hokama, and M. Shimuzu, eds.,
    The Grand Design of America's Justice System, Institute of
    Comparative Law in Japan (1995).

Law, Morals, and Ethics, 19 So. Illinois U.L.J. 447 (1995).

La Nozione di "Substantial Evidence" nel Processo Civile
    Statunitense, 1-1996 Rivista Trimestrale di Diritto
    e Procedura Civil 251 (1996).

Conflict of Interest in the Classic Professions, in R. Spece, D.
    Shimm and A. Buchanan, Conflicts of Interest in Clinical
    Practice and Research (1996).

The Settlement Black Box, 75 Boston Univ. Law Review. 1257
    (1996).

The Client Fraud Problem: A Justinian Quartet, 1 J. Institute for
    Study of Legal Ethics 43 (1996)

The Privity Requirement Reconsidered, 37 So. Texas L. Rev. 967 (1996).

Commentary: Policy Implications [of Lawyers Problems with
    Alcohol], 10 J. Law and Health 79 (1995-96).

Un Codice di Etica Professionale per gli Avvocati Italiani?
    Rivista Trimestrale di Diritto e Procedura Civile,
    Anno L. Fasc. 4-1996.

An Examination Before and Behind the AEntire Controversy@
    Doctrine, 28 Rutgers L.J. 7 (1996).

A Lawyer=s Moral and Ethical Discretion, 8 Researching Law No.2 (1997).

Transnational Rules of Civil Procedure, 30 Cornell Int=l. L.F. 495
-+

Geoffrey C. Hazard, Jr.
Page 14

(1997, with M. Taruffo).

State Supreme Court Regulation of Professional Ethics, 72 Notre Dame
     L. Rev. 1177 (1997).

Protecting the Environment: Finding the Balance Between *Delaney*
     and Free Play, 18 U. Penna. J. Of Int=l Economic Law 487
     (with H. Kunreuther, 1997).

Ethical Dilemmas of Corporate Counsel, 46 Emory L.J. 1011, 1053
     (1997).

Professional Legal Education and Citizen Education, 25 J.
     Japanese Institute of Int=l Bus. Law 1181 (1997) (in
     Japanese, translation by Professor Koichi Miki).

Harmonization of Procedural Law, 44 J. Of Civil Procedure 70
     (Japanese Ass=n of the Law of Civil Procedure) (translated
     into Japanese by Professor Koichi Miki).

Non-Silences of Professor Hazard on AThe Silences of the
     Restatement@: A Response to Professor Menkel-Meadow.@ 10
     Georgetown L. Legal Ethics 1997).

Per L=Indipendenza Professionale Dell=Avvocatura, 1997 Rivista
     Trimestrale di Diritto e Procedura Civile 407.

Discovery and the Role of the Judge in Civil Law Jurisdictions,
     73 Notre Dame L. Rev. 1017 (1998).

The American Law Institute is Alive and Well, 26 Hofstra L. Rev.
     661 (1998).

From Whom No Secrets are Hid, 76 Texas L.Rev. 1665 (1998).

The Duty or Option of Silence, 23 Law & Social Inquiry 139
     (1998).

Reflections on Self-Study [of the American Law Institute], 23 Law
     & Social Inquiry 641 (1998).

The County Courthouse No Longer Looms Over the Community, 51 SMU
     L. Rev. 1559 (1998).

Foreward, Symposium, The Legal Profession: The Impact of law and
     Legal Theory, 67 Fordham L. Rev. 239 (1998).
-+

Substance, Procedure and Practice in Comparative Law, in T.
        Shiibashi, ed., Toward Comparative Law in the 21st Century
        (Chuo Univ. Press 1998).

Preliminary Draft of the ALI Transnational Rules of Civil
        Procedure, 33 Texas Int=l L.J. 489 (1998)

An Historical Analysis of the Binding Effect of Class Suits,
        146 U. Penna L. Rev. 1849 (1998) (with John L. Gedid and
        Stephen Sowle)

The Underlying Causes of Withdrawal and Expulsion of Partners
        from Law Firms,55 Washington and Lee Rev. 1073 (1998)

Individual Justice in a Bureaucratic World, 7 Tulane J. of Int=l

        and Comparative Law 73 (1999)

From Whom No Secrets are Hid [Segretezza e Ricerca della verita
        nel Processo Civile], Rivista Trimestrale di Diritto e
        Procedura Civile, Anno LIII Fasc. 2 B 1999

Responsibility, Professional and Otherwise, 31 Connecticut L. Rev
        1139 (1999)

Regulation of Banking in the United States, in F. Riolo and D.
        Maschiandaro, Il Governe delle Banche in Italia (Fondazione
        Rosselli, Rome 1999).

Abuse of Procedural Rights: A Summary View of the Common Law
        Systems, and Abuse of Procedural Rights: Regional Report
        for the United States, *in* M. Taruffo, ed. Abuse of
        Procedural Rights:  Comparative Standards of Procedural
        Fairness(1999).

Under Shelter of Confidentiality, 50 Case Western Law Rev. 1
        (1999).

Tribute to Harvey Perlman, 78 Nebraska L.Rev. 744 (1999).

Litigio civil sin fronteras: armonizacion y unificacion del
        derecho procesal, Derecho PUC (Revista de la Facultad de
        Derecho del la Pontoficia Universidad Catolica del Peru),
        No. 52, 583 (Abril 1999)

-+

Geoffrey C. Hazard, Jr.
Page 16

The Future of the Legal Profession, in American Bar Association,
        Common Law, Common Values, Common Rights 357-365 (2000)

The Futures Problem, 148 U.Penn.L.Rev. 1901 (2000).

Foreword: The Future of the Profession, 84 Minn.L.Rev. 1083
        (2000).

The Future of the Legal Profession, in American Bar Ass'n, Common
        Law, Common Values, Common Rights, 357-363 (2000).

Globalization, National States, and the Rule of Law, in Jose
        Ciprut, ed., Of Fears and Foes: Security and Insecurity in
        an Evolving Global Political Economy (2000).

Law Practice and the Limits of Moral Philosophy, in Deborah
        Rhode, ed., Ethics in Practice (2000).

Tribute in Memory of Herbert Wechsler, 100 Columbia L. Rev. 1362
        (2000).

Changing Structure in the Practice of Law, 62 Louisiana L.Rev.167
        (2000).

Equality and Affiliation as Bases for Ethical Responsibility, 61
        Louisiana L.Rev.173 (2000).

Environmental Contracts in the United States (with Eric Orts), in
        E. Orts and K. Dekelelaere, Environmental Contracts:
        Comparative Approaches to Regulatory Innovation in the
        United States and Europe (Kluwer 2001)

Transnational Rules of Civil Procedure: A Challenge to Judges and
        Lawyers, 68 Estratto Studi Urbinati, Nuova Serie A-N. 51,3
        247 (1999/2000)

Introduction to the Principles and Rules of Transnational Civil
        Procedure, 33 N.Y.U. J. of International Law and Politics
        769 (with M. Taruffo. R. Sturner and A. Gidi (2001)

Conflicts of Interest in Representation of Public Agencies in
        Civil Matters, 9 Widener J. Public Law 211 (2000).

Globalization, National States and the Rule of Law, in J. Ciprut,
        ed., Of Fears and Foes: Security and Insecurity in an

-+

Geoffrey C. Hazard, Jr.
Page 17

Evolving Global Political Economy at 209 (2001)

Whistleblowing is a Non-issue, Legal Intelligencer (of
        Philadelphia), Feb. 25, 2002, p. 9.

Law and Justice in the Twenty-First Century, 70 Fordham L. Rev.
        1739 (2002)

Fundamentals of Civil Procedure, 6 Uniform Law Review 753 (Revue
        de Droit Uniforme) (2001-4)
Class Certification Based on Merits of the Claims, 69 Tennessee
        L. Rev. 1 (2001)

The Changing Professional Environment and the Ideal of General
        Practice, 30 Hofstra Law Review 759 (2002)

A Short Historical Sketch of the Legal Profession, ZZPInt
        (Zeitschrift fur Zivilprozess International) 6 Band 2001,
        205-238 (with Angelo Dondi)

Principios fundamentales del Proceso Civil
        Transnacional, 54 Derecho PUC 253 (Revista de la
        Facultad de Derecho de la Pontificia Universdad
        Catolica del Peru)(2001)(with M. Taruffo, R.
        Sturner and A. Gidi)

Judicial Redress for Historical Crimes: Procedure, 5
        International Law FORUM 36(2003)

Seeking Justice, Preserving Liberty, 54 Hastings L.J. 695 (2003)

Modeling Class Counsel, 81 Nebraska L. Rev. 1397 (2003)

International Civil Procedure and Transnational Civil Procedure:
        The Impact of Regional Economic IntegrationCAn Overview,
        8 Uniform Law Review 437 (2003-1/2)

Lawyer as Wise Counselor, 49 Loyola Law Rev. 215 (2003)

The ALI/UNIDROIT Project, in M. Andenas, N. Andrews and R.
        Nazzini, eds., The Future of Transnational Civil Litigation
        (2004)

Constitutional Law and Professional Regulation: Reflections on
        Sarbanes-Oxley, King County (Washington) Bar Bulletin,
-+

Geoffrey C. Hazard, Jr.
Page 18

August 2004

A New Player in the Boardroom: The Emergence of the Independent
    Directors= Counsel, 59 The Business Lawyer 1389 (2004 with
    Edward  Rock)

Humanity and the Law, 16 Yale J. Law and the Humanities 79
    (2004).


AAnnouncement@ by Federal Judicial Nominees, 32 Hofstra L. Rev.
    1281 (2004)

Lawyer for the Situation, 39 Valparaiso U. L. Rev. 377 (2004).

Advertising and Intermediaries in Provision of Legal Services:
    *Bates* in Retrospect and Prospect, 37 Ariz. State L. J. 309
    (2005).

Lawyers for Lawyers: The Emerging Role of Law Firm Legal Counsel,
    23 Kans. L. Rev. (2005).

Harmonization of Civil Procedure, 4 Washington U. Global Studies
    Law Review 639 (2005)(with Michele Taruffo).

Law, Ethics and Mystery, 82 U. Detroit Mercy L. Rev. 509 (2005).

Two Valuable Treatises on Civil Procedure, 37 New York U. J. of
    International Law and Politics 611 (2005).

Responsibilities of Judges and Advocates in Civil and Common Law:
    Some Lingering Misconceptions Concerning Civil Lawsuits,
    (with Angelo Dondi) 39 Cornell Int=l L.J. 59 (2006)

The Rhetoric of Disputes in Courts, the Media, and the
    Legislature, 40 Georgia L. Rev. 559 (2006).

Challenges in Law Making in Mass Societies, 67 Louisiana L. Rev.
    1105 (2007)

Jury Trial and the Principles of Transnational Civil Procedure, 2
    Penn State Int'l L.Rev. 499 (2006)

Has the *Erie* Doctrine Been Repealed by Congress?, 156 U.Penn. L.
    Rev. 1629 (2008)

-+

Geoffrey C. Hazard, Jr.
Page 19

Remarks upon Acceptance of Michael Franck Award May 29, 2008,
        2008 Journal of the Professional Lawyer 389 *2008)

Not the City of God: The Multiplicity of Wrongs and Rules, 42
        Akron L. Rev. 1 (2009).

Toward a Revised 4.2 No-Contact Rule, 60 Hastings L. J. 797
        (2009)(with Dana Remus Irwin)

Legal and Managerial "Cultures" in Corporate Representation, 46
        Houston L. Rev. 1 (2009); reprinted, 51 Corporate Practice
        Commentator 571 (2009)

Civil Procedure in Comparative Perspective, Int'l Ass'n
        Procedural Law, 2009 Toronto Conference (2009)

El Rol Constitucional del American Law Institute, in Conferencia
        De Cortes Supremas de las Americas, "El Estado de Drecho,"
        Buenos Aires 3 & $ September 2009 (with Anthony Scirica)

Quasi-Preemption: Nervous Breakdown in Our Constitutional System,
        84 Tulane L. Rev. 1143 (2110)

Civil Procedure in Comparative Perspective, in Janet Walker and
        Oscar Chase, eds., Common Law and Civil Law and the Future
        of Categories (2010), reprinted, 29 Sup. Ct. L. Rev.
        2d) 657 (2010)

Advocacy Revalued, 159 U.Penn. L. Rev. 751 (2011) (with Dana
        Remus)

The Cy Pres Remedy: Procedure or Substance?, 45 U. San Francisco
        L. Rev. 597 (2011)

Processo Civile e Complessita, in A. Dondi, ed., Elementi per
        Una Definizione di Complessita Processuale (2011)

Foreign Judgments: Is "System Fairness" Sufficient?, Berkeley J.
        of Int'l Law Publicist, April 2012 (with Michael Traynor)

Facebook Fallacies, 65 Arkansas L. Rev. 1 (2012)

Edward Cooper as Curator of the Civil Rules, 46 U. Mich. J. Law
        Reform 623 (2013)

Various Newspaper Articles, National Law Journal, 1987-2001
-+

# Exhibit 2

F 206.623.0594

**HAGENS BERMAN**

ATTORNEYS AT LAW
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 EIGHTH AVENUE, SUITE 3300
SEATTLE, WA 98101
www.hbsslaw.com

## MEMORANDUM

**To:**        Geoffrey C. Hazard

**From:**      Ryan Meyer

**Date:**      June 7, 2013

**Subject:**   Hagens Berman's narrative events relating to the subjects of Apple's motion for disqualification

---

### Parties

Hagens Berman Sobol Shapiro LLP ("Hagens Berman") represents FlatWorld Interactives LLC ("FlatWorld") in a patent litigation against Apple, Inc. ("Apple"). Hagens Berman executed an engagement agreement with FlatWorld on March 5, 2012, and a complaint was filed against Apple on April 19, 2012. Complaints were later filed against Samsung and LG, but both of those litigations are irrelevant to Apple's motion. Steve Berman, Mark Carlson, and Ryan Meyer have been the primary Hagens Berman attorneys involved with this case, and the firm's exclusive contact with the clients.

FlatWorld is a small company with two principles: Dr. Slavko Milekic and Jennifer McAleese. Dr. Milekic owns 65% of FlatWorld, and Ms. McAleese owns 35%. Dr. Milekic is a university professor, artist, and self-taught computer programmer. He has degrees in medicine, cognitive science, and psychology. He has long had an interest in how people with lower or impaired levels of cognitive abilities, such as children and people with autism, perceive and interact with the world. As a result of his background and interests, in or about 1997 he conceived and reduced to practice an invention that allows a user to interact intuitively with a computer through gestures. This invention became the throw (sometimes called a "flick" or "swipe") gesture that is now commonly used in personal computers, smart phones, tablets, etc. Through a touch screen or other input device, a person swipes her finger across the screen such that, when a certain threshold velocity is met, an image is "thrown" off of the screen. He filed for a patent on this invention on June 12, 1998, and a patent was subsequently granted in 2005. Shortly thereafter, the patent entered a process called a "reissue" to try to add some new, broader claims (claims are the part of a patent that define the invention), and the patent reissued on April 17, 2012 as the RE43,318 patent.

The patent application was drafted and prosecuted by a patent attorney named Gordon "Gene" Nelson. He was involved also with FlatWorld's pre-litigation investigation of various potential targets, including Apple.

Memorandum
June 7, 2013
Page 2

Dr. Milekic used his invention in the late 1990's and early 2000's to develop interactive computer exhibits for the Speed Art Museum and the Phoenix Art Museum. Sometime in 2006, he met Jennifer McAleese, and together they formed FlatWorld in January 2007 for the purposes of monetizing the patent. FlatWorld had a consulting business, which included creating an interactive computer display for the Philadelphia Zoo. FlatWorld also unsuccessfully tried to develop a PowerPoint plug-in based on the patented invention.

Ms. McAleese formerly worked in finance and now works for a non-profit group. Using her financial and management skills, she has acted as FlatWorld's business manager. She is married to John McAleese, who was an environmental law partner in the Philadelphia office of Morgan Lewis & Bockius LLP ("MLB") until May 10, 2013. Neither Ms. McAleese or Mr. McAleese have knowledge of or experience with patent law or the technical aspects of the patented invention. Mr. McAleese has from time to time provided guidance and assistance to his wife, and has received communications from Ms. McAleese related to the affairs of FlatWorld, including email communications with counsel and copies of final filed or served pleadings.

**Prelitigation Events**

Before FlatWorld engaged Hagens Berman as litigation counsel, FlatWorld offered its potential patent litigation case to several other law firms. These interactions generated documents which have either been produced or listed on a privilege log, to the extent that those documents are responsive to Apple's discovery requests, in the possession of FlatWorld, and located during FlatWorld's search for documents. FlatWorld also spoke with several patent monetization entities such as Acacia and Rembrandt, which help patentees sell or enforce their patents, and Ocean Tomo/ICAP, which assists patentees in auctioning their patents. These documents have also been produced or listed on a privilege log to the extent that those documents are responsive to Apple's discovery requests, in the possession of FlatWorld, and located during FlatWorld's search for documents. Mr. McAleese was copied on, or was forwarded, some of these communications. In some instances, he provided assistance, such as recommending a firm or commenting to his wife on terms of engagement.

**Hagens Berman's Limited Interactions with John McAleese**

FlatWorld began communicating with Hagens Berman regarding potential representation in early 2012. All communications were between either Steve Berman or Mark Carlson and Jennifer McAleese, with one exception. On February 27, 2012, John McAleese called Mark Carlson to discuss certain terms of the engagement agreement. There was no discussion of any other subject. Mr. McAleese did not disclose that he was employed by MLB, nor did he disclose that MLB had performed patent prosecution work for Apple. There was no discussion of any potential defendant, no discussion of Apple, and no discussion of litigation tactics or strategy.

There was no contact, direct or indirect, between John McAleese and Hagens Berman from February 27, 2012 until February 13, 2013. After the deposition of Dr. Milekic in

Memorandum
June 7, 2013
Page 3

Philadelphia on February 13, towards the end of a lunch with Ms. McAleese, Dr. Milekic, and Mr. Carlson, John McAleese appeared and introduced himself. He asked how Dr. Milekic did during the deposition, and Mr. Carlson said that he did well. He then sat down with Dr. Milekic and discussed their respective boats in a conversation in which neither Mr. Carlson nor Ms. McAleese participated. This was the first and only time that anyone from Hagens Berman met John McAleese in person. There was no discussion of any other aspect of the litigation with Mr. McAleese because any such discussion would have waived the attorney-client privilege.

The next time anyone at Hagens Berman spoke with John McAleese was on February 26, 2013. John McAleese's cell phone records show that between February 26 and March 1, 2013, there were eight calls from John McAleese to Mark Carlson.[1] These calls followed Apple's complaint (on or about February 26) to Morgan Lewis that Mr. McAleese had been listed on FlatWorld's privilege log. The February 26 call was the first time that anyone at Hagens Berman learned that Mr. McAleese that Apple was a client of MLB.

Mr. McAleese called Mr. Carlson on February 26 to request that Hagens Berman produce the documents of which Mr. McAleese was an author or recipient and which Hagens Berman had listed on FlatWorld's privilege log. Mr. McAleese requested this production to demonstrate to Morgan Lewis and Apple that he had not acted as FlatWorld's attorney. Mr. Carlson believed that this call was initiated either at the direction of or on the behalf of Apple or MLB, not in Mr. McAleese's personal capacity. Mr. Carlson did not know that Mr. McAleese was communicating information that Apple would later allege was confidential.

Mr. Carlson refused John's request to produce documents because producing the documents to MLB and Apple would waive FlatWorld's privilege. Mr. Carlson informed Mr. McAleese that he did not believe FlatWorld had asserted attorney-client privilege as to any communication between Mr. McAleese and his wife. He stated that he thought FlatWorld had asserted the attorney-client privilege only as to the underlying communications between FlatWorld and its attorneys (not Mr. McAleese) and that the forwarding email to Mr. McAleese was protected by the spousal privilege. Mr. Carlson told Mr. McAleese that he would check the privilege log, and if the documents were incorrectly logged, he would have the log corrected.

Upon reviewing the relevant privilege log entries, Mr. Carlson learned that the forwarding emails to Mr. McAleese had not been correctly logged, and directed that the log be amended on February 26. After the log was corrected, he reviewed each of the relevant log entries and the described documents, and confirmed that the log was correct. On February 27, FlatWorld served the corrected privilege log.

---

[1] Some of these calls were only two minutes long and may represent a call terminated before connection, or communication with a receptionist rather than a conversation between John McAleese and Mark Carlson. Mr. Carlson recalls speaking with Mr. McAleese only once on each of the three dates.

Memorandum
June 7, 2013
Page 4

On February 28, Mr. McAleese called Mr. Carlson again.  He stated that the corrected privilege log had not resolved the problem, and that the documents reflecting communications with his wife would have to be produced to Apple.  Mr. Carlson refused again, because to do so would waive the privilege.  He offered to discuss with FlatWorld whether it would agree to produce the documents provided that Apple would agree that no privileges were waived.  After the call with Mr. McAleese terminated, Mr. Carlson had separate telephone conferences with Jennifer McAleese, and later with Dr. Milekic.  He explained that the interests of Ms. McAleese and Dr. Milekic were not identical with respect to production of the documents.  He explained the risks and benefits of production.  Ultimately, the principals of FlatWorld agreed that Mr. Carlson could offer to produce the documents without waiver.

Mr. McAleese called Mr. Carlson again on March 1, and Mr. Carlson stated that he could inform MLB and Apple that FlatWorld would agree to produce the documents reflecting communications with Mr. McAleese provided that Apple would agree that production does not constitute a waiver.  Mr. McAleese relayed this offer to MLB, which in turn discussed it with Apple.  That evening, Michael Ossip told Mr. McAleese that Apple conceptually agreed with this proposal and asked that Mr. McAleese contact Mr. Carlson to propose terms for the agreement.  Mr. McAleese contacted Mr. Carlson on March 1, and asked that Mr. Carlson propose language.

On March 1, Apple served subpoenas on MLB and John McAleese, seeking all documents reflecting any communication between Mr. McAleese and anyone from FlatWorld.  The only responsive documents were communications between Mr. McAleese and his wife.  Mr. McAleese engaged separate counsel for purposes of responding to the subpoena.

On March 3, Mr. Carlson drafted terms as the body of an email message that he sent to Mr. McAleese.  Apple never responded.

On March 5, Mr. Carlson informed Apple's litigation counsel that the subpoenaed records are subject to the spousal privilege, and requested a discovery conference to avoid having to move for a protective order.  Apple's counsel responded on March 6, requesting more information.  Mr. Carlson replied immediately.  Apple did not respond, and on March 7 Mr. Carlson informed Apple's counsel that FlatWorld would move for a protective order.  Apple asked for additional time, and sent correspondence with numerous questions about the corrected privilege log.  FlatWorld's counsel responded to the questions, and a discovery conference was scheduled for March 14.

Apple has alleged that the February 26 communication, and the calls between John McAleese and Mark Carlson that followed, were an improper disclosure of Apple's confidential information.  The alleged privileged information was the fact that Apple objected to John McAleese's presence on FlatWorld's privilege log.  Apple had communicated its objection to

Memorandum
June 7, 2013
Page 5

MLB, and John relayed this information to Hagens Berman.  However, this same information was communicated to Mark Carlson by Apple's counsel, Michael Pieja, in the March 14 discovery conference, in which Mr. Pieja asserted that Mr. McAleese had violated professional ethics and he threatened that Apple "would get to the bottom of this."  Thus, the very information that Apple contends constitutes a confidential communication to MLB that was improperly communicated by Mr. McAleese to Hagens Berman on February 26 was communicated directly by Apple's litigation counsel to Hagens Berman on March 14.[2]

Hagens Berman has never received any confidential Apple information, whether directly or indirectly, from John McAleese or Jennifer McAleese.  Though Ms. McAleese has forwarded email communications and final pleadings from Hagens Berman to John McAleese, he has never had any communications with Hagens Berman about any aspects of this litigation.  Further, he never communicated advice, suggestions, or any other comments about this litigation indirectly through Jennifer McAleese insofar as Hagens Berman can determine.  In fact, though kept informed about all case developments, Ms. McAleese and Dr. Milekic have made no substantive contributions to the strategy, tactics, or management of this case, preferring to rely on the knowledge and expertise of Hagens Berman.

On May 13, 2013, MLB informed Hagens Berman that it had hired Steptoe & Johnson LLP to investigate whether there was any evidence that Mr. McAleese had received or accessed confidential Apple information.  This investigation was aided by MLB's IT department.  Steptoe determined that Mr. McAleese never received or accessed confidential Apple information from MLB's network.

**FlatWorld's Privilege Logs**

FlatWorld produced the first version of its privilege log on February 22, 2013.  During the review and coding of FlatWorld's documents, the persons charged with reviewing privileged documents recognized and properly logged attorney-client privileged communications between Ms. McAleese or Dr. Milekic and FlatWorld's attorneys, but failed to recognize the issue of whether the privilege was waived when Ms. McAleese forwarded the privileged communications to her husband.  The forwarding emails should have been logged as protected by the spousal privilege.  When Mr. McAleese called Mr. Carlson to complain that he had been improperly included as a FlatWorld attorney on FlatWorld's privilege log, Mr. Carlson stated that he should

---

[2] Apple would likely argue that the issue is one of timing.  That the communication was intended to be confidential when it was made to MLB, and that Mr. McAleese's communication of Apple's objection caused Hagens Berman to "change its privilege strategy" to discard the privilege between Mr. McAleese and FlatWorld and assert spousal privilege instead.  In fact, the only effect of the communication was to call Mr. Carlson's attention to the fact that the forwarding emails had been incorrectly logged.  This correction would have been made upon discovery regardless of whether or not Apple had objected because FlatWorld did not regard Mr. McAleese as its attorney.  Mr. Carlson simply did not know that the forwarding emails had been incorrectly logged until he examined the log after the telephone call with Mr. McAleese.

Memorandum
June 7, 2013
Page 6

not have been identified as a FlatWorld attorney and he offered to check the log for the spousal privilege and correct it if it had not been properly asserted. It was only after reviewing the forwarding emails and checking them against the privilege log that Mr. Carlson learned that the spousal privilege had not been asserted for Ms. McAleese's forwarding emails to Mr. McAleese. FlatWorld promptly corrected the privilege log to properly assert the spousal privilege on February 27, 2013.

On page 23 of Apple's motion, Apple draws particular attention to a change in the description of entry 473 of FlatWorld's privilege log. This change was made in view of FlatWorld and John McAleese's position that he was not FlatWorld's attorney. The underlying document is an email between Jennifer McAleese, Dr. Milekic, and Gordon Nelson for the purposes of discussing a potential agreement with Acacia, a patent monetization entity. Mr. Nelson was included as a recipient for the purpose of receiving his advice. In the email, Jennifer asked whether she should contact Jack Kenney, FlatWorld's corporate attorney, to work on terms of the agreement. Ms. McAleese states in the email that John McAleese had reviewed the Acacia agreement and had made some comments regarding some of the terms. The change to the privilege log was made openly and was not made for the purpose of deception or concealment.

All of the communications to or from John McAleese that are listed on FlatWorld's privilege log contain an underlying attorney-client privileged communication. For example, there are emails between Jennifer McAleese and FlatWorld's counsel that she forwarded to Mr. McAleese. However, some of the documents listed on the MLB and John McAleese logs contain communications between Jennifer and John McAleese with no underlying attorney-client communication. For those documents, the spousal privilege has been asserted as to the communication between John and Jennifer, and the rest of the communication (*e.g.*, an earlier part of an email thread which included an accountant as a recipient) was produced.

Subsequent, to the February 27 amendment, other errors have been discovered in FlatWorld's privilege log, most of which appear to be due to cut and paste errors generated in the creation of the privilege log spreadsheet. None were due to a deliberate effort to conceal or mischaracterize the listed documents. FlatWorld has worked diligently and voluntarily to update and amend its privilege log to remove any such errors.

Apple complains in its disqualification motion that there is not a 1:1 relationship between the documents listed in the various privilege logs, *e.g.*, FlatWorld's privilege log does not list all of the documents listed in John McAleese's privilege log and vice versa. Apple contends that this reflects an attempt by FlatWorld, Hagens Berman, and/or John McAleese to conceal, destroy, or mischaracterize evidence. FlatWorld has, at the direction of Hagens Berman, performed a reasonably thorough search of its documents to identify all documents responsive to Apple's discovery requests, and no documents have been intentionally withheld and not logged, or destroyed by FlatWorld, its principals, or Hagens Berman. All responsive documents that

Memorandum
June 7, 2013
Page 7

were located have been produced or logged.  Hagens Berman investigated the apparent
discrepancies between the logs and determined that they were due to (1) differences in discovery
requests between the parties (*i.e.*, not all documents responsive to the subpoenas were likewise
responsive to the requests served on FlatWorld), (2) the documents not logged by FlatWorld
were, in fact, produced, (3) the documents allegedly not logged by FlatWorld were, in fact,
logged as email threads, (4) in 2008 and 2009 Ms. McAleese closed two past email accounts and
now relies solely on a Gmail account (the two past accounts were not closed to purposely
conceal or destroy documents, and it is unlikely that any documents in those accounts were
material to resolving any of the claims and defenses in this case), and (5) a small number of
documents were overlooked during FlatWorld's search, but this was unintentional.  No
responsive documents were intentionally concealed or destroyed.

RM:rm